IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

BRYAN KEITH FOSTER, #1409530,    §
ET AL.                           §
                                 §
VS.                              §        CIVIL ACTION NO. 6:07cv555
                                 §
MAXEY CERLIANO, ET AL.           §

MEMORANDUM OPINION AND
ORDER OF DISMISSAL

Plaintiff Bryan Keith Foster, an inmate confined in the Texas prison system, and his wife

Brandi Foster, filed the above-styled and numbered civil rights lawsuit pursuant to 42 U.S.C. §

1983. They are also bringing supplemental state claims. The Defendants are Gregg County, Sheriff

Maxey Cerliano and Dr. Lewis Browne. The complaint was referred to the undersigned by consent

of the parties pursuant to 28 U.S.C. § 636(c). The present Memorandum Opinion concerns the

Defendants' motion for summary judgment (docket entry #44), the Plaintiffs' response (docket

entry #55) and Defendants' reply (docket entry #57).

Plaintiff's Allegations

The original complaint was filed *pro se* on December 10, 2007. Counsel for the Plaintiffs

first made an appearance on April 17, 2008. The Plaintiffs filed their first amended complaint

(docket entry #28) on April 23, 2008.

The following discussion of the facts of the case comes from the first amended complaint.

Plaintiff Bryan Keith Foster was arrested and confined in the Gregg County Jail on March 25, 2006.

He remained in the jail until May 22, 2006. He was originally charged with the offense of robbery.

1

He subsequently pled guilty to a reduced charge of terroristic threat and was sentenced to four years confinement in the Texas prison system.

At the time of his arrest, Foster was under the medical care of an infectious disease specialist for osteomyelitis (bone infection) and recurrent infections to the left leg. He informed jail officials of his condition and asked to see a doctor on multiple occasions. On March 27, 2006, Brandi Foster visited the jail and attempted to deliver her husband's medication that was prescribed by the infectious disease specialist, but jail officials refused to accept the medicine, contact Foster's doctor to confirm his medical needs or arrange for Foster to see a doctor or other health care professional. The condition of the Plaintiff's leg worsened. By April 2, 2006, the leg was swollen, painful and caused difficulty walking. Following a fall on that day due to pain, weakness and swelling, jail personnel requested the Plaintiff's medical records. The records were received on April 19, 2006, and reviewed by Defendant Dr. Browne. The medical records showed Foster's medical history and ongoing treatment of recurrent infection and osteomyelitis in his left leg. Foster alleges that despite this knowledge, Dr. Browne and other officials at the Gregg County Jail did nothing to try to diagnose, evaluate or treat his leg infection.

Foster states that he fell again on May 5, 2006, due to the infected, painful and severely swollen condition of his leg. He received a laceration to the head during the fall. Dr. Browne examined him and found that Foster was suffering from nausea, vomiting, fever, a swollen leg and a complete loss of sensation in his left leg and foot. Foster alleges that there was no attempt to diagnose, evaluate or treat the infected leg. On May 17, 2006, Dr. Browne was called again because Foster's condition had worsened. The leg was more swollen, discolored and obviously infected. Foster alleges that Dr. Browne made no attempt to diagnose, evaluate or treat his leg.

On May 18, 2006, following another fall, Foster was placed in a wheelchair and moved to the drunk tank. He was moved there without any medical examination or treatment. A nurse examined him while he was in the drunk tank and found that his left foot was turning purple and black, with a faint pedal pulse, and severely swollen with no sensation. The nurse notified Dr. Browne, who purportedly made no attempt to evaluate or treat the Plaintiff. On the following day, Foster asked Dr. Browne to send him to the hospital, and Dr. Browne denied the request.

Brandi Foster visited her husband in the jail on May 20, 2006. She found him weak, pale, feverish, with a grotesquely swollen and discolored left leg. She demanded that her husband receive immediate medical attention. A nurse employed by the jail looked at him and took no action.

On May 22, 2006, Brandi Foster and Foster's criminal attorney obtained an audience with Judge Stoudt. Foster's criminal case was pending before Judge Stoudt. Judge Stoudt went to the Gregg County Jail to see the Plaintiff. Upon observing Foster's condition, Judge Stoudt ordered Dr. Browne to send Foster to the hospital for treatment. Foster was never returned to the jail. After weeks of intravenous antibiotics and surgical procedures attempting to save the leg, Foster's leg was amputated on or about September 12, 2006, at Presbyterian Hospital in Dallas, Texas. He was subsequently convicted of making a terroristic threat and confined in the Texas prison system.

The Plaintiffs contend that Dr. Browne and the medical staff at the jail were deliberately indifferent to Foster's known medical needs. Moreover, their conduct was under color of statute, ordinance, regulation, custom or usage in violation of 42 U.S.C. § 1983. The Plaintiffs alleged that Gregg County had delegated the final authority over medical services and decisions to Dr. Browne and that Gregg County was vicariously liable for the deliberate indifference of Dr. Browne.

The Plaintiffs additionally brought supplemental state claims. They cited Sections 74 and 101 of the Texas Civil Practice and Remedies Code. They asserted that Dr. Browne was guilty of the negligent use of tangible property, which was the proximate cause of their injury and damage. It was alleged that as a proximate result of the negligence and deliberate indifference of the Defendants to Foster's medical needs, Brandi Foster sustained a loss of consortium consisting of a reduction in the aid, assistance and financial support that her husband is able to provide due to the loss of his left leg. Moreover, as a direct result of being unable to care for her husband and maintain her employment, Brandi Foster was forced to terminate her employment as a cardiac stenographer at Good Shepherd Medical Center, where she earned a salary of $50,000 per year.

## Defendants' Motion for Summary Judgment

The Defendants filed a motion for summary judgment (docket entry #44) on September 15, 2008. They denied that they were deliberately indifferent to Foster's serious medical needs. They asserted that Gregg County does not have a policy, custom or practice of violating the constitutional rights of inmates. They argued that the competent summary judgment evidence shows that there was no evidence of deliberate indifference. They argued that Sheriff Cerliano has no supervisory liability in this case. They argued that the individual defendants, Dr. Browne and Sheriff Cerliano, are entitled to qualified immunity from suit. With respect to the state claims, the Defendants argued that there was no merit to the Plaintiffs' claims under the Texas Tort Claims Act and the medical liability claims. They further argued that Dr. Brown and Sheriff Cerliano are entitled to official immunity with respect to the state claims. In support of the motion for summary judgment, the Defendants submitted affidavits from Dr. Lewis Browne, Nurse Deborah Crager, Nurse Paula Mooty, Nurse Patsy White, Sheriff Maxie Cerliano and Dr. Daniel H. Bolin. The Plaintiff's Gregg

County Jail records were attached to Sheriff Cerliano's affidavit. The jail records are extensive and primarily consist of medical records.

The Defendants asserted a series of undisputed facts from the summary judgment evidence. They noted that Foster was a thirty-eight year old white male at the time he was confined in the jail. He received a severe beating in 1998, resulting in a severe, disabling injury to his left knee. More specifically, the injury consisted of severe bony, ligamentous and cartilaginous injury and the near loss of his left lower extremity, distal to the knee. The left knee injury has required 12 to 15 procedures to stabilize the extensive treatment and to treat the multiple infections, resulting in chronic osteomyelitis. The Defendants noted that Foster has numerous medical records dating back to the 1998 injury. An emergency room report from Christus Schumpert Health System, dated January 2, 2006, had a diagnosis of chronic left lower extremity pain and no evidence of left knee re-infection by the patient. Such records also noted Foster's dependence on narcotic medication.

Foster was incarcerated in the Gregg County Jail on March 25, 2006, with a medical intake history of Post-Traumatic Stress Disorder ("PTSD") and left leg bone infection. Officer Wyatt noted Foster attempted to overdose earlier on the morning of his admission to jail, and he thought that Foster was suicidal. Dr. Browne was notified on March 25, 2006, at 4:00 p.m. He prescribed Zoloft for depression and Diovan for high blood pressure. Dr. Browne examined and evaluated Foster for the first time on April 5, 2006, for complaints of leg pain. Dr. Browne increased Foster's prescription for Imipramine to 100 mg. and Tylenol extra strength was begun. Dr. Brown saw Foster again on April 19, 2006. After reviewing his medical records, Dr. Browne made a diagnosis of old osteomyelitis and noted apparent drug seeking behavior. Dr. Browne examined Foster twice on May 2, 2006. Dr. Browne documented that Foster indicated that he had fallen twice and was

5

not sleeping well. Dr. Browne adjusted Foster's medication and gave him permission to use a cane. On May 5, 2006, Nurse Comley indicated that Foster complained of falling in the cellblock. A call was placed to Dr. Browne, who ordered a complete blood count and sedimentation rate. Foster's temperature was noted to be 97.3 degrees, and a small cut was noted to the left eyebrow. Dr. Browne received the laboratory results from the sedimentation rate and the completed blood count on May 9, 2006, and these tests were normal. The sedimentation rate shows whether there is an infection.

Nurse Crager made several entries in the medical chart on May 18, 2006. She responded to information that Foster may have fallen and hit his head. She observed him lying on his back and rolling his upper torso from side-to-side. Foster complained of tenderness to the back side of his head and pain to the left knee, indicating that his knee was numb. She helped him back to the wheelchair. She gave him an ice pack and 600 mg. of Ibuprofen. Approximately thirty minutes later, she responded to a complaint that his foot was changing colors and that it was numb. She removed his socks and noticed a slight dusky color to his left foot. The color returned to the foot when it was held off of the chair seat on which Foster had the foot resting. Faint pulses in his foot were noted. She observed that neither the outer aspect of his left knee nor the knee cap region was tender when pressed. The inner aspect of his left knee appeared to be tender because he moved the leg away from contact during the exam. She contacted Dr. Browne to brief him on her observations and Foster's complaints and request for x-rays. Dr. Browne gave no new orders at that time.

On May 19, 2006, Foster complained of feeling feverish and of pain in his left knee. Nurse Crager noted that his pulse was 117, his temperature was 100.3 and that his left knee was warm to the touch and slightly swollen. A non-bleeding puncture wound was noted on the following day,

and Dr. Browne was consulted for a pressure dressing. Early on the morning of May 22, 2006, Foster's temperature was noted to be 102.9 with a pulse of 124. Nurse Comley noted that he was shaking and having chills. Dr. Browne was advised of the findings. He ordered a complete blood count and sedimentation rate and ordered to begin Keflex, a broad based antibiotic, 500 mg., four times a day. The lab results were received by Dr. Browne at 1:40 p.m. The results indicated that Foster may have an infection. Dr. Browne issued orders to send Foster to the emergency room for evaluation. The emergency room confirmed a diagnosis of left knee infection. A referral was made to Dr. Jordan Stanley. Foster was admitted from May 22, 2006, through May 31, 2006. Incision and drainage of the left knee was performed May 22, May 24 and May 26. Foster was released from the hospital with his infection cured.

Foster was next hospitalized on July 12, 2006, at Presbyterian Hospital in Dallas, where an AV fistula was established in the left knee and he was prepared for additional knee reconstruction. Foster left the hospital, against medical advice, on July 13, 2006.

Foster was readmitted to Presbyterian Hospital in Dallas on July 19, 2006, anticipating surgical reconstruction of the knee. The surgery was cancelled because of co-existent cellulitis in the same knee. His cellulitis was treated and his discharge date was August 1, 2006. Surgery was cancelled because of Foster's nicotine dependence and his inability to remain cigarette free.

Foster was hospitalized a third time following his discharge from the Gregg County Jail on September 5, 2006, at Good Shepherd Medical Center, after presenting to the emergency room with a polysubstance overdose. He was discharged on September 7, 2006, with a discharge diagnosis of suicide attempt, polysubstance overdose, major depressive disorder, chronic pain, PTSD, substance abuse, with prescription drug addiction, and a history of left leg trauma and osteomyelitis.

Foster was admitted at Presbyterian Hospital on September 7, 2006, with a discharge date of September 21, 2006. After medical stabilization at Presbyterian Hospital, an amputation of Foster's left leg was performed just above the knee. The amputation was performed at the insistence and encouragement of Foster and his wife. The Defendants noted that Foster commented that he wanted the amputation "to get on with his life." The discharge diagnosis was non-functional left lower extremity due to devastating injury, chronic, due to left knee and left tibia trauma. Re-admission to Presbyterian Hospital occurred on September 21, 2006, with a discharge date of September 27, 2006. He was admitted to the psychiatric unit for further treatment of Depression versus Bipolar Disorder. The Plaintiff was subsequently convicted of making a terroristic threat.

The Defendants attached an affidavit from a retained medical expert, Dr. Daniel Bolin. Dr. Bolin is a medical doctor in Wichita Falls and specializes in occupational medicine, addictionology and correctional medicine. He reviewed Foster's medical records and noted Foster's ongoing problems with his leg since 1998. He expressed the opinion that the well documented medical records show that Foster received excellent and appropriate medical care while confined in the Gregg County Jail. He noted that Dr. Browne was either telephoned or actually examined Foster on 11 different occasions. He added that it was not medically probable that Dr. Browne should have made his diagnosis before May 19, 2006, and probably not before May 22, 2006. He specified that he saw no evidence of deliberate indifference or that standards of medical treatment were breached.

The Court will fully discuss the Defendants' legal arguments as to why they are entitled to summary judgment in the Discussion and Analysis section of this Memorandum Opinion.

<u>Plaintiffs' Response</u>

The Plaintiffs filed a response to the Defendants' motion for summary judgment (docket entry #55) on October 29, 2008. In support of their response, the Plaintiff submitted an affidavit from Brian Foster, a document entitled Principles and Practice of Infectious Diseases, and another document entitled Campbell's Operative Orthopaedics. It is specifically noted that their factual evidence to contest the motion for summary judgment consisted of only Foster's affidavit. They did not submit any medical documentation or an affidavit from a medical expert regarding the care provided to Foster.

The Plaintiffs provided another view of the facts of this case, which is supported by Foster's affidavit. Foster reiterated that Dr. Browne had knowledge of his condition from the time of his arrest and did nothing to evaluate, diagnose or treat him until complaints from his family led to his admission to the hospital on May 22, 2006. Foster noted that Dr. Browne received and reviewed his medical records on April 19, 2006, but Dr. Browne failed to render any treatment that was medically acceptable until May 22, 2006. He asserted that his condition had worsened by then to a near fatal infection, which had progressed too far to save his leg.

The Plaintiffs cited the medical standards for deliberate indifference, which will be fully discussed in the Discussion and Analysis section of this Memorandum Opinion. They cited the documents regarding infectious disease and orthopaedics to note that osteomyelitis is not considered curable and that it may recur at any time. In treating chronic osteomyelitis, antibiotic therapy alone is usually unsuccessful. Effective antibiotic treatment of chronic osteomyelitis in most cases requires that the type of antibiotic therapy be based on cultures taken at debridement surgery or from deep bone biopsies and antibiotic limitations or susceptibilities. Chronic osteomyelitis can

not be arrested until the nidus or focal point of the infection is surgically removed. The effective treatment of osteomyelitis includes patient evaluation, staging assessment, the administration of antibiotics, debridement surgery to remove nonviable tissue, and dead space management. The initial and most common symptom of infection is pain. Fever is not always a consistent finding. In osteomyelitis infections, systematic signs, such as fever and malaise, may not be present in the early phases. Pain and localized tenderness over the involved bone are the more frequent findings. Blood cultures identify the infecting organism in only about 50% of patients. Bone aspiration should be performed to aid in establishing an accurate bacteriological diagnosis. The Plaintiffs argued that the application of these established medical standards to the facts alleged by them presents more than enough evidence to preclude summary judgment.

## Defendants' Reply

The Defendants filed a reply to the Plaintiff's response, which includes a motion to strike Foster's affidavit (docket entry #57). They correctly noted that a nonmoving party may not rest on mere allegations or denials in the pleadings, but must designate specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). The mere allegation of a factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* Further, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc). "Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence, and the testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment." *Lechuga v. S. Pac. Transp. Co.*, 949 F.2d 790, 798 (5th Cir. 1992).

In the application of these standards, the Defendants characterized Foster's short response as little more than a feeble collection of his own self-serving allegations coupled with statements from a medical treatise. The treatise, while discussing the symptoms and treatments for various infections, simply does not produce a genuine issue of material fact which could preclude summary judgment. They argued that Foster's affidavit is a textbook example of the type of self-serving, unsubstantiated affidavit which is incapable of defeating summary judgment. First of all, Foster baldly asserted, without supporting documentation, that his wife brought to the jail all of the medication, including antibiotics, he was taking and informed the jail staff that he needed to take the medications. Foster then flatly asserted that he was never given any medications. Further, he alleged that Dr. Browne "was made aware of [his] left leg infection and [his] need to take [his] medications]." The Defendants asserted that Foster offered no other summary judgment evidence which would show how Dr. Browne "was made aware" of any infection in his leg, or any corroborating evidence that Foster was not given his medications. The Defendants stressed that apart from the conclusory affidavit, he provided no summary judgment evidence which would show that he was not given his medication.

The Defendants noted that Foster's affidavit alleged that Dr. Browne received and reviewed his medical records on April 19, 2006, and became aware of his osteomyelitis at that time. They noted that Foster did not point to any objective summary judgment evidence which would show that Dr. Browne did, in fact, receive those records at that time, or whether Dr. Browne had any subjective knowledge of the infection. The Court would note, however, that Dr. Browne specified in his affidavit that he met with Foster on April 19, 2006. Dr. Browne added, "[a]fter reviewing his medical records, a diagnosis of old osteomyelitis and apparent drug seeking behavior was

noted." From Dr. Browne's affidavit, a conclusion can be made that he was aware of Foster's history of osteomyelitis, although there is nothing to support a conclusion that Foster had an infection at that time.

The Defendants also noted that Foster cited excerpts from a learned treatise, but Foster failed to connect in a meaningful way his own experiences, the information in the treatise, and his allegations of deliberate indifference. They also noted that Foster's response contains no citations to summary judgment evidence which connects the actions of Gregg County with the symptoms contained in the treatise aside from his own self-serving, conclusive, and unsubstantiated allegations. They correctly noted that unverified, unsubstantiated, and self-serving allegations simply cannot be the basis of a genuine issue of material fact. *See Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004) (finding affiant's self-serving statements in his affidavit insufficient to raise a genuine issue of material fact).

The Defendants concluded their reply by arguing that the summary judgment evidence submitted by Foster is unverified, unsubstantiated, conclusory, and self-serving. As such, the affidavit is precisely the type of summary judgment evidence which the Fifth Circuit has held does not create a genuine issue of material fact. *See Douglas*, 79 F.3d at 1430; *Lechuga*, 949 F.2d at 798. They argued that Foster's summary judgment evidence is defective and not the proper basis of a genuine issue of material fact. They asked that the Court strike the affidavit and not consider it when deciding the motion for summary judgment.

## Discussion and Analysis

Summary judgment is proper when the pleadings and evidence on file show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). The moving party for summary judgment has the burden of proving the lack of a genuine issue as to all the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1221-23 (5th Cir. 1985).

In deciding a motion for summary judgment, the Court must make a threshold inquiry in determining whether there is a need for a trial. "In other words, whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." 477 U.S. at 247-48. In making this threshold inquiry, the Court must consider that "[s]ummary judgment is proper when, viewed in the light most favorable to the non-moving party, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Smith v. Xerox Corp.,* 866 F.2d 135, 137 (5th Cir. 1989) (citations omitted); Fed. R. Civ. P. 56(c).

Once the movants make a showing that there is no genuine material fact issue to support the nonmovant's case, the nonmovant cannot survive a motion for summary judgment by resting on the allegations in his pleadings. *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 199 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988); *see also Celotex*, 477 U.S. at 324. Rather, he must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. To carry this burden, the nonmovant must present evidence sufficient to support a resolution of the factual issues in his favor. *Anderson*, 477 U.S. at 257. Summary judgment is proper if the affidavits, depositions, answers, and admissions on file

fail to establish the existence of an element essential to the plaintiff's case and as to which he will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23. The nonmovant must submit competent summary judgment evidence sufficient to defeat a properly supported motion for summary judgment. *See, e.g., Burleson v. Texas Dept. of Criminal Justice*, 393 F.3d 577, 589-90 (5th Cir. 2004); *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). Factual controversies are to be resolved in the nonmovant's favor only when both parties have submitted evidence of contradictory facts. *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004). The facts as presented by the moving party must be accepted as true if the nonmoving party fails to submit any competent evidence which creates a general issue of material fact. *Id.*, Local Rule CV-56(c).

The Defendants argued that they are entitled to summary judgment based on qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526 U.S. 603, 614 (1999). The doctrine of qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992), *citing Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The objective reasonableness of an official's conduct must be measured with reference to the law as it existed at the time of the conduct in question. *Anderson*, 483 U.S. at 639; *Jackson v. City of Beaumont Police Department*, 958 F.2d 616, 620 n. 5 (5th Cir. 1992) (citations omitted). *See King v. Chide*, 974 F.2d 653 (5th Cir. 1992) (discussing qualified immunity in the context of

14

force used against an arrestee).  The evaluation of a qualified immunity defense involves a two-step

process, which was recently discussed by the Supreme Court as follows:

> In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case." *Ibid.*

*Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007);  *Bias v. Woods*, No. 05-10890, 2008 WL 2902565

(5th Cir. July 29, 2008).  The Fifth Circuit has stated that the second step concerns whether the

officer's conduct was objectively reasonable in light of the law that was "clearly established" at the

time of the alleged violation.  *Bias v. Woods*, at *3.  In *Scott v. Harris*, the Supreme Court also

specified that "[w]hen opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that

version of facts for purposes of ruling on a motion for summary judgment. . . .  Respondent's

version of events is so utterly discredited by the record that no reasonable jury could have believed

him.  The Court of Appeals should not have relied on such visible fiction." 127 S.Ct. at 1776.

In light of *Scott v. Harris*, the threshold question for the Court's consideration is whether

the facts taken in a light most favorable to Foster show that the Defendants violated a constitutional

right.  The constitutional issue involved in this case concerns the medical care provided to Foster.

The Fifth Circuit has held that the deliberate indifference standard applies to medical claims by

pretrial detainees.  *Hare v. City of Corinth*, 74 F.3d 633, 647 (5th Cir. 1996).  The Fifth Circuit held

that "the episodic act or omission of a state jail official does not violate a pretrial detainee's

constitutional right to be secure in his basic human needs, such as medical care and safety, unless

the detainee demonstrates that the official acted or failed to act with deliberate indifference to the detainee's needs." *Id*. at 647-648. In *Farmer v. Brennan*, 511 U.S. 825, 835 (1994), the Supreme Court noted that deliberate indifference involves more than just mere negligence. The Court concluded that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

In *Domino v. Texas Department of Criminal Justice*, the Fifth Circuit discussed the high standard involved in showing deliberate indifference as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

239 F.3d 752, 756 (5th Cir. 2001). "[I]nadequate medical care by a prison doctor can result in a constitutional violation for purposes of a § 1983 claim when that conduct amounts to deliberate indifference to [the prisoners's] serious medical needs, constitut[ing] the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999) (internal quotation marks omitted).

The undisputed facts of this case reveal that Foster was confined in the Gregg County Jail for just under two months from March 25, 2006, until May 22, 2006. Foster had a long history of

osteomyelitis dating back to 1998. Prior to his incarceration, he repeatedly had procedures to treat multiple infections. Jail intake records noted Foster's history of PTSD and left leg bone infection. Dr. Browne was notified about Foster upon his arrival at the Gregg County Jail. Dr. Browne was informed about Foster's attempted overdose earlier in the day on March 25, 2006. Dr. Browne prescribed Zoloft for depression and Diovan for high blood pressure. Dr. Browne did not ignore Foster's condition as it was reported to him at that time. He saw Foster for the first time on April 5, 2006, in response to complaints of leg pain. Dr. Browne increased Foster's prescription for Imipramine and provided him extra strength Tylenol. Dr. Browne did not ignore Foster's condition as it was known to him at that time. There is no competent summary judgment evidence showing that Foster had an infection in his left leg at that time. Dr. Browne examined Foster again on April 19, 2006. He reviewed Foster's medical records. He noted Foster's old osteomyelitis and drug seeking behavior. Once again, there is no competent summary judgment evidence showing that Dr. Browne knew that Foster had an infection in his left leg or had any reason to suspect that he had an infection in his left leg at that time. Dr. Browne examined Foster twice on May 2, 2006. Foster indicated that he had fallen twice and was not sleeping well. Dr. Browne adjusted his medication and permitted him to use a cane. Dr. Browne was once again responsive to Foster's situation. On May 5, 2006, Dr. Browne received a report that Foster had fallen in his cell. Foster's temperature was 97.3 degree, and he had a small cut to his left eyebrow. Dr. Browne ordered a complete blood count and sedimentation rate. Once again, Dr. Browne was responsive to Foster's situation. The tests came back normal. There was no sign of any infection. The results of the tests did not trigger a duty on the part of the Defendants to provide any additional medical care at that time.

Nurse Crager responded to reports that Foster may have fallen and struck his head on May 18, 2006. She observed him lying on his back and rolling his upper torso from side-to-side. He complained of tenderness to the back side of his head and pain to his left knee. She gave him an ice pack and Ibuprofen 600 mg. She subsequently examined his foot and observed a slight dusky color to his left foot. Normal color returned to his foot when it was held off of the chair seat on which Foster had the foot resting. She reported her observations to Dr. Browne, who did not see a need for further action.

The pivotal day was May 22, 2006. Foster's temperature was noted to be 102.9 with a pulse of 124. He was shaking and having chills. Dr. Browne was notified of his condition. He responded by ordering a complete blood count and sedimentation rate. He also ordered antibiotics. The lab results came back at 1:40 p.m. The results indicated that Foster possibly had an infection. Dr. Browne issued an order to have Foster taken to the emergency room. Once again, Dr. Browne was responsive to Foster's medical needs. There is nothing in the competent summary judgment evidence that gives rise to an inference that Dr. Browne or medical personnel responded to Foster's medical needs with deliberate indifference or with a wanton and unnecessary infliction of pain.

Foster's allegations in light of the competent summary judgment evidence at best supports a claim that the medical care could have been better; however, allegations regarding the inadequacy of medical treatment cannot amount to a violation of federal rights. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Moreover, his disagreement with the treatment provided by a doctor does not rise to the level of a constitutional violation. *See Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Foster has not shown a violation of his constitutional rights. The Defendants are entitled to summary judgment.

18

The Court notes that the Plaintiffs alleged in their pleadings that Foster was sent to the hospital based on Brandi Foster's actions. The only evidence in support of this allegation comes from Foster's affidavit, but the only statement made by him was that a man came to his cell with a wheelchair on May 22, 2008, who told him he was being taken to the hospital. He found out on the following day that his wife had written to or visited with the judge, who "gave orders to take him to the hospital, not Dr. Browne." Foster did not support his assertions with any competent summary judgment evidence. The Defendants appropriately characterized his affidavit as self-serving and conclusory. The Supreme Court has made it clear that when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment. Foster's factual allegations in his affidavit are so blatantly contradicted by the record that no reasonable jury could believe it. His conclusory allegations may not be used to deny the Defendants' motion for summary judgment.

The Court further notes that Foster's stay in the Gregg County Jail ended when he was sent to the emergency room. The competent summary judgment evidence reveals that medical personnel made incisions to and drained his left knee on May 22, May 24, and May 26. His infection on that occasion was resolved, and then he was released. Foster did not address nor offer any competent summary judgment evidence disputing the Defendants' competent summary judgment evidence. Subsequently, consistent with the recurring problem, he developed another infection in July, 2006, but he left the hospital against the advice of medical personnel. He returned to the hospital six days later, was treated and released. He returned to the hospital again in September, 2006, after an overdose. He then told medical personnel to amputate his leg in order "to get on with his life." The

intervening recurring problem with his leg does not support a conclusion that his amputation was the fault of the Defendants.

The Supreme Court specified in *Scott v. Harris* that the second prong of the qualified immunity analysis need not be discussed if the nonmoving party has not shown a constitutional violation. The Plaintiffs have not shown a constitutional violation, and the individual Defendants are entitled to summary judgment based on qualified immunity on that basis alone. The individual Defendants are entitled to summary judgment based on qualified immunity for the additional reason that the Plaintiffs neither addressed nor cited any competent summary judgment evidence showing that their conduct was objectively unreasonable in light of clearly established law. Dr. Browne and Sheriff Cerliano are entitled to summary judgment based on qualified immunity.

Gregg County is entitled to summary judgment because the Plaintiffs have not shown that Gregg County may be held liable. The Plaintiffs mentioned vicarious liability. The doctrine of *respondeat superior* does not apply in § 1983 actions. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

In *Board of County Comm'rs of Bryan County v. Brown*, the Supreme Court noted that the line of cases starting with *Monell* require that a "plaintiff seeking to impose municipal liability under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." 520 U.S. 397, 403 (1997). The Supreme Court discussed these concepts as follows:

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. . . . Similarly, an act

performed to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Id.* at 403-04 (citations omitted). A "plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* at 404. In cases where a "plaintiff is seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. . . . A showing of simple or even heightened negligence will not suffice." *Id.* at 406-407 (citations omitted). Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. *Id.* at 410. To satisfy the deliberate indifference prong, a plaintiff must ordinarily shown a pattern of violations. *Estate of Davis ex re. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005).

The Plaintiffs did not develop their claim that Gregg County should be liable. They asserted without any development that Gregg County should be liable because of its policies, customs and practices. They did not cite any competent summary judgment evidence to counter Gregg County's argument that it is entitled to summary judgment. The Defendants are entitled to summary judgment with respect to the Plaintiffs' constitutional claims.

Finally, the Plaintiffs' lawsuit included supplemental state claims based on Chapters 74 and 101 of the Texas Civil Practice and Remedies Code. The Defendants appropriately noted that they failed to develop these claims. Nevertheless, since the primary constitutional claim should be dismissed, the Court should not consider the supplemental state claims. The state claims should be dismissed without prejudice. *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966);

*Hamill v. Wright*, 870 F.2d 1032, 1038 (5th Cir. 1989); *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986). It is accordingly

   **ORDERED** that the Defendants' motion for summary judgment (docket entry #44) is **GRANTED**. It is further

   **ORDERED** that the Plaintiffs' federal claims are **DISMISSED** with prejudice and state claims are **DISMISSED** without prejudice. It is finally

   **ORDERED** that all motion not previously ruled on are **DENIED**.



**So ORDERED and SIGNED this 9th day of December, 2008.**



JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE